The UNITED STATES of America for Use and Benefit of R. J. STUDER & SONS, H. C. Studer, and E. I. Studer, Company, a Joint Venture, Plaintiffs,

v.

The AETNA CASUALTY AND SURETY COMPANY, Fireman's Fund Insurance Company, Hartford Accident and Indemnity Company, the Travelers Indemnity Company, United States Fidelity & Guaranty Company, Employers Reinsurance Corporation, Fidelity and Deposit Company of Maryland, General Reinsurance Company, and American Re-Insurance Company, all corporations, and Peter Kiewit Sons' Co., a Corporation, Defendants.

Civ. No. 920.

United States District Court
D. South Dakota, W. D.

Aug. 13, 1965.

Cooke, Moulton, Bellingham & Longo, Billings, Mont., and Bottum & Beal, Rapid City, S. D., for plaintiffs.

Bangs, McCullen, Butler & Foye, Rapid City, S. D., for defendants.

BECK, Chief Judge.

The above entitled action having been tried to the court, without a jury, in the United States District Court at Aberdeen, South Dakota, and thereafter having been submitted to the court upon oral argument and written briefs, and the court having had the matter under advisement now makes and enters the following:

## FINDINGS OF FACT

1.

That Peter Kiewit Sons' Company, a corporation on August 1, 1961, in consideration of $56,220,274, entered into a written contract with the United States of America, Department of the Army, for the construction of the Minuteman Missile facilities at the Ellsworth Air Force Base near Rapid City, South Dakota.

2.

That Kiewit on August 21, 1961 [1], in consideration of $2,601,315, subcontracted a part of its contract to Summit Construction Company, a corporation, which in turn two days later subcontracted to the R. J. Studer & Sons, H. C. Studer and E. I. Studer Company, a joint venture, under a written contract which under this record is identified as Plaintiff's Exhibits 35 and 35A.

3.

That Summit without fault on the part of Studer ended that contract on July 14, 1962.

4.

That Studer, thereafter on August 2, 1962, in conformity with the provisions of 40 U.S.C.A. §§ 270b–270d, permitting recovery in such cases against the sure-

1. No. DA-04-548-ENG-55.

ties of the prime contractor, served written notice on Kiewit of the amounts it had earned on its subcontract as of said termination date, and that this action is for the recovery of that claim against those sureties and not against Kiewit.

### 5.

That the parties, to the extent they agree are in accord on the following: (1) percentage earnings under the general provisions of the contract and extras, $1,016,251.08:[2] (2) credits in the form of payments by Summit to Studer and back charges, not challenged, $845,431.-85; and (3) a resulting balance on July 14, 1962 of $170,819.23. In dispute, on the other hand, aside from claims for interest, is $101,026.64, with $60,121.39 thereof computed on $1.75 per cubic yard of 29,591.92 cubic yards of Silo excavations below the hereinafter explained −11.79′, with $51,785.86 as a result, $8,335.53 on an alleged mistake of 4,-763.16 cubic yards computed on the same per cubic yard price, and $21,472.25 and $19,433 as wage and subsistence hikes forced on Studer in September 1961 and up to the date his contract was ended.

### 6.

That a directive for excess excavations[3] "at Silo" from Kiewit to Summit and from it to Studer[4] during the week of August 29, 1961, in the form of plans and drawings and minus excavation elevations at the project, changing from −12′ at the upper part and −32′ at the lower to a −11.79′ and −32.48′, resulted in an increase at the silo level of 29,591.92 cubic yards and in the cost thereof to Studer at the unit price of $51,785.86.

### 7.

That Studer used scrapers on his excavations down to the −11.79′ elevations and "backhoe" for those of the Silos to −32.48′.

### 8.

That the scraper method to the −12′ level, as specified in the original subcontract, later changed to −11.79′ and the backhoe method in the Silos to −32′ and later to −32.48′, respectively, were on a unit price bidding basis at 50¢ per cubic yard and $1.75, plaintiff's Exhibits 35, 41 at page S-9, subparagraph SC-7, and 38.

---

2. The parties under the record arrived at that amount on the basis of the following computations:

| | | |
|---|---:|---:|
| "Earned per Ex. 1–30 | $983,466.59 | |
| Less Backhoe @ 40¢ | 7,550.40 | |
| | | $975,916.19 |
| Earned per Ex. 31A–31K | | 13,082.00 |
| Earned per Ex. 32–A–32III | | 11,065.12 |
| Earned per Ex. 32A–33III | | 16,187.77 |
| Total per above Exhibits | | $1,016,251.08". |

Plaintiff's reply brief, Amended Schedule A, defendants' Brief, page 5.

---

3. Plaintiff's Exhibit 35: "It is understood that this is a lump sum Contract and unit prices apply only to excess excavations performed by direction of Contractor." Plaintiff's Exhibit 41: *Breakdown of Contract Lump-Sum Prices*. "In addition to the requirements of paragraph GC-5, "Progress Charts and Requirements for Overtime Work," the Contractor shall furnish a detailed breakdown of the contract lump-sum prices allocating the contract price at the various features of each item of work. Submittal shall be in accordance with Table A, SC-16. This breakdown will be used for estimating progress payments, and shall be subject to the approval of the Contracting Officer."

"#10 Exc. at Silo −12′ to −32′ 220,000 @ 1.75 385,000.00", Plaintiff's Exhibit 38.

4. Plaintiff's Exhibits 37a—37g.

**9.**

That the factors for calculating said $170,819.23 and the $51,785.86 were available to Studer and Summit on July 14, 1962, as were wage and subsistence increases.

**10.**

That the 4,763.16 cubic yards for which recovery is sought at $1.75 per, was included in Studer's per unit bid of his lump sum contract price of 220,000 cubic yards at $1.75, plaintiff's Exhibit 38, and therefore not within the directive contained in plaintiff's Exhibits 37a–37g.

**11.**

That Studer during the month of September 1961, in compliance with certain special terms and conditions of his subcontract [5], not to permit delays and in that connection not to allow demands for higher wages, strikes—actual and threatened—and pending labor disputes to hinder progress, was compelled to add increases in wages and subsistence to the workers, which from that time on until July 14, 1962, totaled $40,905.25, plaintiff's Exhibits 49 and 50.

**12.**

That the defendants are questioning those increases, not on the ground they are incorrect, or not incurred, or not paid by Studer, but only on the theory that allowance would violate the parol evidence rule.

**13.**

That all of the aforementioned provisions contained in Footnote 5 hereof were by reference incorporated into and made a part of the Summit-Studer subcontract.

**14.**

That the Kiewit operation under its prime contract was vast and complicated, extending as it did over several counties in western South Dakota, with a perimeter of several hundred miles, involving structures, big and small, thousands of details and employment of hundreds of men skilled and otherwise. Time was of the essence, completion dates had to be observed, ordinary tolerances in view of the reasons for the Missiles were almost out, practical means for achieving of end results were the customs each day and seldom was there time for written covenants carefully phrased.

**15.**

That while Studer stresses those circumstances as reasons for relaxing of the parol evidence rule and even viewing of

---

5. Plaintiff's Exhibit 35: "Section 10. It is understood and agreed that the work provided for in this agreement constitutes only a part of the work being performed for the Owner by the Contractor and other subcontractors. The Subcontractor, therefore, agrees to perform the work called for in this agreement in such a manner that he will not injure or damage any other work performed by the Contractor or any other subcontractor, and further agrees to pay the Contractor for any damage that may be caused to such other work by the Subcontractor or by his agents or employees."

Plaintiff's Exhibit 41, page S-2: "d. *Completion of Work as Scheduled.* This project is an element of the Ballistic Missile Program. In the interest of national security, it is extremely important that contract completion dates are met. The Contractor's attention is directed to General Condition GC-5 'Progress Charts and Requirements for Overtime Work.' Multi-shift operations may be required on various work increments to meet the approved schedule of operation. In addition, the Contractor shall take steps necessary to avoid delays in the completion of the work. Such steps shall include, but not be limited to:

(1) Measures which are necessary to permit working during all seasons of the year including adverse weather conditions.

(2) Planning the procurement, ordering and delivery of materials in detail so that delays due to the nonreceipt of scheduled deliveries will be eliminated or minimized.

(3) *Scheduling and coordinating all operations including those of subcontractors to insure timely progress.* (Emphasis supplied)

(4) Providing additional working forces."

the increased labor costs as a separate oral contract, the court refers adherence to the contract theory adopted at the trial, as it finds, Kiewit, in September 1961, after the subcontract had been made, under said subsection "d(3)" exercising its prerogative *"to insure timely progress"* (emphasis supplied) by directives to all subcontractors for increases in wage and subsistence costs with the significant omission to assume those extras, as it had agreed during the negotiations, and on this trial grounding its defense under the rule that the negotiations were merged in the written instrument and in the process as the court further finds, avoiding the obvious inference that said subsection "d(3)" and other parts related thereto, *on its face was ambiguous, indefinite, vague and obscure and therefore subject to the exception to the evidence rule sought to be invoked as a defense.* Ostensibly unlimited under that language, are the powers of the prime contractor and arbitrary to the point of permitting increases beyond the scope of the written instrument. Hence, subject to the exception, with competency thus ascribed to the oral testimony, found sufficient, that Kiewit, Summit and Studer had agreed that he under his subcontract would be fully covered on the increases he now demands.

### 16.

That Studer on July 14, 1962, under his subcontract with Summit had earned $263,510.34 with interest from that date, which as of this time amounts to $48,-749.41, or a total of $312,259.75.

From the foregoing Findings of Fact the court makes the following:

### CONCLUSIONS OF LAW

### 1.

That the court has jurisdiction over the subject matter and the parties under the provisions of 40 U.S.C.A., Sections 270b–270d, and that this action is against the surety defendants and not Kiewit.

### 2.

That Kiewit-Summit subcontract became and was a part of the Studer subcontract under the reference and incorporation provisions thereof shown on page 1.

### 3.

That the provisions in the subcontract found in the sheet attached thereto, which provides for "additional initial excavation" at 40¢ per cubic yard, by a process of elimination as shown by the Findings are immaterial.

### 4.

That R. J. Studer & Sons, H. C. Studer and E. I. Studer Company, a joint venture, under its subcontract with Summit on August 23, 1961, identified as plaintiff's Exhibits 35 and 35A, the excess excavations "at Silo", plaintiff's Exhibits 37a–37g, and increased wage and subsistence costs, plaintiff's Exhibits 49 and 50 and all other parts in the record relating thereto, is entitled to a Judgment to be entered by the clerk against the Aetna Casualty and Surety Company, Fireman's Fund Insurance Company, Hartford Accident and Indemnity Company, The Travelers Indemnity Company, United States Fidelity & Guaranty Company, Employers Reinsurance Corporation, Fidelity and Deposit Company of Maryland, General Reinsurance Company, and American Re-Insurance Company, for $312,259.75 and interest from the date of the Judgment at 6% per annum.

Let judgment be entered accordingly.